(No. 32523.—

Ed LEHMAN, Appellee, *vs.* MAX L. HILL, Appellant.

*Opinion filed January 22, 1953—Rehearing denied March 24, 1953.*

F. E. MERRILLS, and OTIS E. GUYMAN, both of Belleville, for appellant.

LINDAUER, LINDAUER & PESSIN, and HENRY W. NIEMAN, both of Belleville, for appellee.

Mr. CHIEF JUSTICE CRAMPTON delivered the opinion of the court:

Appellant, Max L. Hill, defendant in the circuit court of St. Clair County, below, seeks review of a decree of that court declaring Ed Lehman entitled to the office of sheriff at the election held on November 7, 1950. The canvass of the votes showed Hill, the Democratic candidate, the winner by a majority of 306 votes. Lehman contested and the trial judge, after lengthy and protracted hearings, held all the ballots cast at the election in Centreville Township, precinct No. 2, Centreville Township, precinct No. 5, and Stites Township, precinct No. 1, were illegal and void and declared the plaintiff below, Ed Lehman, the Republican candidate and appellee here, the duly elected sheriff by a majority of 284 legal votes.

Appellant makes a number of points. The first contention is that the circuit court has no jurisdiction to hear this contest. The Election Code provides (Ill. Rev. Stat. 1949, chap. 46, par. 23-4) that the circuit court in the respective counties may hear and determine certain contests (not including sheriffs) "and concurrent jurisdiction with the county court in all cases mentioned in Section 23-5 hereof." Section 23-5 provides "The county court shall hear and determine contests of election of all other county, township and precinct officers, and all other officers for the contesting of whose election no provision is made." (Ill. Rev. Stat. 1949, chap. 46, par. 23-5.) The rule *expressio unius est exclusio alterius*—the mention of one thing implies the exclusion of another thing—is a maxim applied to statutory construction as an aid in arriving at intention. It is not of universal application and should not be used to defeat the apparent intention of the legislature. The maxim is not appropriate here, for the circuit court is, by statute, expressly given concurrent jurisdiction with the county court to hear and determine the cause, and we have heretofore upheld this jurisdiction in the circuit court. *Smith* v. *Reid,* 223 Ill. 493; *Zeman* v. *Dolan,* 279 Ill. 295.

The second point of contention is made that if the court undertakes a recount of the ballots it must count them all, relying upon the authority of *Wood* v. *Hartman,* 381 Ill. 474, 481. The point was not made or argued in the trial court probably because of the stipulations of the parties entered into and waiving the counting of all the ballots. There were a number of stipulations, but the vital one in its pertinent parts provided: "It is further stipulated that the recount of the ballots in the precincts, not previously counted, shall continue by the tellers previously appointed by the Court, and under the same conditions. It is further stipulated that neither party, by reason of any stipulation entered into, shall be required to count the ballots of all of the remaining precincts." We think this

stipulation and the fact defendant himself made a motion to exclude certain precincts from the recount disposes of this particular contention without need of further comment.

The controlling issue in the case is joined in the disposition of the votes in Stites Township, precinct No. 1. The trial court found there were only approximately sixty persons entitled to receive assistance at the polls, as disclosed by the permanent registration records, yet the unquestioned evidence reveals that hundreds of voters actually were given assistance by one of two persons, either Mayor Terry or Marcelus West, the latter a person not entitled to assist, being neither a judge nor a clerk of election and that, in such instances, no affidavits or oaths were administered prior to the giving of assistance. Hundreds of blank affidavits for assistance were included in the election supplies taken to the home of William Terry the night preceding the election. These disappeared and no satisfactory explanation was made or advanced and no effort was made to supply them after their disappearance became apparent. The lower court properly held this course to be a fraud and unlawful misconduct to the extent that the freedom and equality of the election in this precinct were destroyed and that the poll could not be purged of such unlawful votes, that it was impossible to determine the legal votes cast, and, as a result, the entire poll was rejected. The evidence in the record further indicates many applications for ballots made by "X" mark, making it impossible to determine who received assistance; the wearing of political insignia in the polling place; the presence of many special policemen bearing arms; and various other fraudulent and illegal practices.

In addition to the foregoing circumstances, the chancellor had before him other controlling factors that led to his conclusion that the ballot box under inquiry was a receptacle of fraudulent votes; William Terry who was in complete command was a person whose authority was far-

reaching and widespread; he was a Democratic election judge; he was also mayor of Brooklyn, a village within the confines of the voting precinct; he was superintendent of schools in the village of Brooklyn; he was also supervisor of Stites Township which was coextensive with the boundaries of Stites Precinct No. 1.

An attorney testified that he and Terry had heated words because Terry refused to hand out the blue ballots pertaining to the constitutional amendments. Only 150 blue ballots were cast. The permanent registration records were not consulted or used to check signatures and addresses. The appellee appeared at the polling place in a futile effort to protect his rights and pulled Terry out of a booth while he alone was in the process of giving assistance to a voter.

Mayor Terry had his chief of police assisting in and out of the polls throughout election day. Also, Mrs. Terry was about the polling place with a well-filled wallet. Witness Boatner, an election judge, stated "he didn't know if she was giving money away, lending it or paying debts." Also aiding the Democratic cause was Lafayette White, relief investigator for Stites Township, who acted as a checker.

The decree of the chancellor found a total of 33,310 votes for the plaintiff, Ed Lehman, and 33,026 votes for defendant, Max Hill, or a majority in favor of Lehman of 284 votes. In Stites Township, precinct No. 1, Hill received 681 votes, Lehman 209, for a total of 890 votes. All of these votes were expunged and not counted by the trial court. Therefore, if properly ruled upon, there were enough votes purportedly cast and held illegal in this precinct alone, of the three in controversy, sufficient to change the result as shown by the original official canvass. We announced the rule applicable under such circumstances in *Emery v. Hennessy,* 331 Ill. 296, wherein we said: "There is a distinction, in the nature of things, between particular illegal votes which may be proven and exactly computed, and the effect of fraudulently stuffing the ballot-box by the

election officials. Where the election officials participate in such glaring frauds as were shown by the evidence to have been perpetrated in the fifth district no one can estimate or compute to what extent the entire poll was permeated by such fraud. Questions affecting the fairness of an election are of vital importance in this country, as popular self-government depends upon their proper solution. It seems clear that courts must abnegate the power of preserving freedom of elections and abandon the polls to the violent and unscrupulous, or must take the ground that wherever such practices or influences are shown to have prevailed, not slightly and in individual cases but to such extent that they cannot be computed, the whole poll must be rejected. [Citation] The rule obtains in elections, as in other affairs, that a man shall not profit by his own wrong, nor by that of others done to allow him to reap the benefit. The only means by which approximate justice may be reached when the illegal acts render the result doubtful is to require the party to whose benefit they inure to purge the poll of their effect, or to suffer the penalty of having its majority excluded from his count of votes. [Citation] When the ballot-box becomes the receptacle of fraudulent votes the freedom and equality of elections are destroyed. That election is free and equal where all of the qualified electors in the precinct are carefully distinguished from the unqualified and are protected in the right to deposit their ballots in safety and unprejudiced by fraud. That election is not free and equal where the true electors are not separated from the false, where the ballot is not deposited in safety or where it is supplanted by fraud." This case does not come within the rule announced in a long line of cases, and the recent expressions of this court, (*Neff* v. *George,* 364 Ill. 306; *Smoda* v. *Gallagher,* 412 Ill. 271,) requiring apportionment of the votes between the candidates according to the legal votes cast, for the reason that here the particular votes claimed to be illegal could not be segregated,

proved, and exactly computed. Where fraud permeates the whole of the ballot box the whole poll must bé rejected. Where fraud exists, as here, the parol-evidence rule must yield, and the requirement of oath or affidavit before assistance can be given to the voter is mandatory. *McCreery* v. *Burnsmier,* 293 Ill. 43.

Only one other serious question remains open to review in this case. Appellant asks us to reverse our more recent cases with respect to the initialing of the ballots by a clerk rather than by a judge of election, as occurred in Centreville Township, precincts 2 and 5. It is true this court has changed its position in this matter. For many years, through a long line of decisions, we held it to be mandatory that a judge of election initial the ballot. This rule was later changed and the requirement of the statute was held to be directory, only. In the recent case of *Harvey* v. *Sullivan,* 406 Ill. 472, we fully discussed this situation, reviewed all the authorities, and reverted, adhered to, and reaffirmed our decision that the statute is mandatory as announced in *Tuthill* v. *Rendelman,* 387 Ill. 321. In *Harvey* v. *Sullivan* we said "The law is clear, and no good reason suggests itself for departing from either its letter or spirit." Further discussion of the subject will accomplish little and continued vacillation on our part will only confuse the matter. Whatever may be said on the side of the argument that a ballot should be sufficient if initialed by a duly appointed election official, whether he or she be a judge or a clerk of election, is carried from here straight into the hands of the legislature, whose duty it is to determine whether a voter or voters shall be disenfranchised by the failure of the duly appointed officials to perform the plain mandate of the statute governing elections.

The trial court found, among other things, that the plaintiff's witnesses were truthful and worthy of belief while others were contradictory, showed many wide discrepancies and variances, and that some of the latter testi-

mony could be given little or no credence. To analyze the evidence and proceedings in the lengthy record would only serve to unduly prolong this opinion, to no avail. A careful review of the record leads to but one conclusion, that the chancellor, who was in a position to see and hear the witnesses and to determine the issues after long and extensive hearings, was justified in entering the findings and the decree herein, and we see no reason to interfere with his conclusions. The decree of the circuit court of St. Clair County is, therefore, affirmed.

*Decree affirmed.*

MAXWELL and HERSHEY, JJ., took no part in the consideration or decision of this case.